Our third case today is 2016-2641, Allied Mineral Products v. OSMI. Mr. Lyles, please proceed when you're ready. Thank you, Judge Moore, and may it please the Court. From Allied Minerals' perspective, this is obviously an important case for it, but we also think it's an important case for the Court. We think it's an important case for the Court for at least three reasons. One is all these things are due to the consequences of affirming the district court's opinion. In our view, affirming the district court's opinion is totally, dramatically underlines the whole policy of MedImmune. Secondly, affirming the district court's opinion would essentially create a new jurisdictional rule which says you can't consider affirmative acts or declaratory judgment actions, which happen outside of the U.S. or at least you have to... Does your claim that MedImmune requires no acts whatsoever or permits? No. We believe it does require affirmative acts. We believe there are affirmative acts here. The affirmative acts did occur outside the United States. They occurred in Mexico. And affirmative acts... What affirmative acts occurred specifically towards your client? The filing of the lawsuit. The filing of the lawsuit was an allegation by Steller, the defendant in this DGI action, that our Mexican distributors were infringing the patent based on the sale of our product. It's also an allegation to us that our product falls within the parameters of this Mexican patent, which by the way is identical to the U.S. patent. Is Mexican patent law identical to U.S. patent law in all respects? The answer is no. It's actually no in lots of respects. In many ways it isn't. But what they're saying by alleging that the product, which is manufactured in the U.S., what they're saying is that by asserting infringement in Mexico, what they're saying is our product has elements, let's call them A, B, C, and D, when it's in Mexico. Since the U.S. patent is identical to that in the U.S., it necessarily implies that the same product has elements A, B, C, and D. When you say implies, you're inviting us to speculate. You're inviting us to speculate that despite the differences in Mexican law and U.S. law, that the finding of infringement in Mexico is going to imply that you have an invalid patent in the United States. We don't believe that the question of whether or not it actually infringes in Mexico is relevant. We believe that Mexican law is such that an allegation that the product comes within the scope of that claim, which is identical to the U.S., is at least in the same technology and at least close enough that it certainly implies that the product has those same characteristics when it crosses the border. So infringement in Mexico implies an invalid patent in the United States? We're not talking about invalidity at this point. We're just talking about whether or not there is an allegation. That's the point. We don't know what we're talking about. We're speculating here. And I'm speculating along with you. We're not speculating what the complaint says. We have to take all the allegations that the complaint is true. The complaint says that this product manufactured in the U.S. infringed certain specific claims in Mexico. Those claims that are allegedly infringed in Mexico are identical to the U.S. claims and based on the same specification. Setting aside the U.S. versus Mexico, just setting that aside for a minute, how do you overcome ERAS? Even assuming that this had been a litigation that was filed perhaps in the U.S. against your distributors, how do you overcome ERAS? You're talking about the customer? The two-part test. The adverse legal interest, as we understand it, the only thing it requires is it is met fully whenever, as is here, that there is a legitimate claim of action based on the same facts against the declaratory judgment action. Here, because it's a product claim, this is not a case in ERAS which is whether or not there is contributory infringement and whether or not it is possible that the Mexican distributors are infringing without... Yeah, that's not been alleged, right? It hasn't been alleged anywhere that there's been contributory or induced infringement by your client. Based on a product claim. By your client. It hasn't been alleged anywhere, right? I'm sorry, I hadn't been alleged. I think you were saying that contributory and induced infringement against your client has not been alleged in any of the pleadings in the Mexican litigation. That's correct. Right? So that was one of the tests. The test is there has to be either an indemnification agreement or controversy involving induced or contributory infringement. And you don't see either on the facts here. But in ERAS, that's only when there's not direct infringement of the product. Here we have an allegation of direct infringement of the product. And the reason that the allegations of contributory infringement come into play is because that means that there is independent potential liability on behalf of the product manufacturer. I understood ERAS as saying that where there's an allegation of direct infringement against the customers in that litigation. The litigation in ERAS was an allegation of direct infringement against customers. And then there was something in the pleadings that suggested contributory induced infringement against the declaratory judgment plaintiff in the other case, the one who was the manufacturer. So I don't understand why you're saying there's no allegation of direct infringement in ERAS. Because it doesn't come into play when there is a cause of action against the declaratory judgment plaintiff. Here, because it's a product, okay, and it's a product claim, any allegation that the distributors are infringing is in itself an allegation that the supplier is also infringing. That's us. Okay. Okay. And that's the difference between ERAS. Okay. Because we already – it's clearly an allegation that they could have brought the claim against us, which meets the declaratory judgment standard. I understand. So in a situation when there is a direct infringement claim, you're saying ERAS does not include the situation where the manufacturer itself could be accused of direct infringement. Yes. It could come into play if there was something other than a product claim or where they were doing something else with the product. But here, there's no allegation they're doing anything different with the product, and it's the product itself that is the claim. So that's why – that's always been the standard. I must have missed it. I see that you and Judge Stoll have sort of reconciled your understanding of ERAS, but I don't think I yet have it, so why don't you repeat it again for me. Okay. Why is ERAS different from this case? I believe what has always been the case with – what we're talking about is having an adverse legal interest. I'm going to just add one thing here. It says BT has accused Cable 1 of infringing system and method claims. So if there's a system, why would there not be a direct infringement claim here in ERAS? It's talking about system claims and method claims. Yeah. I mean, it says system throughout, actually. Well, I think ERAS, if you read ERAS carefully, and I think it's briefly – quite frankly, I don't have adequate recall of it due to – I think it was in the briefing. But I think the gist of it is that when you determine whether or not there's an adverse legal interest, you determine whether or not the underlying legal action that the D.J. defendant could have brought the same action against the plaintiff. Here, the answer is they could have. And so that's the only thing that's necessary for an adverse legal interest, and we believe that to adopt the district courts – But your view, it seems to me, even though they seem to have gone to great pains to avoid not only accusing you of infringement, but of having any contact with you at all by not even responding to your reaching out to them, your view would result in a scenario where every distributor and every manufacturer would have a D.J. action in any jurisdiction they choose to file it in. If any one person anywhere in the chain gets sued by the patentee. How does that make sense? Wouldn't that subject patentees to enormous, broad, harassing litigation? I mean, that doesn't seem consistent with MedImmune, which still focused on affirmative acts against the party who brings the D.J. action. I think they have an affirmative act against the D.J. plaintiff's product. That's the key. It's the product that's being accused of infringement. Yes, but do you not see the problem with what you're asking for? A product is sold in a distribution chain. Suppose it's manufactured by Company A and distributed by Companies B, C, D, and E all over the United States. Your position, which you would like this court to adopt, is that if the patentee sues any one of those people, then all of the others can sue for a D.J. action against the patentee because it's the same product. I think that any time there is an underlying legal action that is applicable to the declaratory judgment plaintiff, then that establishes an adverse legal interest under the existing law. Counselor, what's your concern here? The effect that this has on the Mexican market for your product or the effect it has on the U.S. market? From Alan's viewpoint, this is actually a brilliant but, quite frankly, sinister scheme. These are both U.S. companies, and they have patents both in the U.S. Normally, since a product has been manufactured in the U.S., the logical thing to do is if they had some concern about it, it would be to sue an ally in the United States. They didn't do that. Instead, what they did is they picked a much- The judgment would be if they take one, it's limited to Mexico. I'm sorry? If they take a judgment, then it's limited to the Mexican market. It's not the judgment that's a concern. It's the cloud of uncertainty that arises. Where does that cloud exist? The cloud exists both in Mexico and the United States. In our view, that's the brilliance. If you have that cloud in the United States, why don't you sue in the United States? We have sued in the United States. For the declaratory judgment. That's correct. We sued to remove that cloud because we believe that- This is a public record. They got identical patents with identical claims on the identical product. Show me a case where we've said that casting a cloud or uncertainty in the market is enough to file for a declaratory judgment. I think the whole jurisprudence following- I think it talks more about an act, an affirmative act. Than a cloud? No. The act here, the affirmative act, is two things. Number one, it's the accusations against the distributors. But even more importantly, the filing of the lawsuits against the distributors. And accusing our product of infringement in Mexico. That's the affirmative act. We're not suggesting that you don't need an affirmative act. We believe you do need an affirmative act. And maybe not all affirmative acts do. But here, when you've got the identical patents and the identical claims against the identical product, the inference is undeniable that you're creating uncertainty with respect to whether or not the continued sale and manufacture of that in the United States is something that is permitted under the law. And what we believe that they're doing is they're using this to essentially extend the period of uncertainty. It's bad enough that we had sued in Mexico. And Mexico, by the way, we believe the reason they chose that particular market is it's much smarter than the U.S. But it moves, quite frankly, litigation there at sort of a glacial pace. But still they're selling in the United States the product that they sold in Mexico? Yes. They're selling in the U.S.? They are. And the Mexican product is manufactured in the United States. And it's sold directly by Allied in the United States. So your concern is they can take a Mexican judgment and show up in the U.S. and say, we have the same problem here. And, oh, by the way, look, we have a Mexican judgment dealing with essentially the same patent. That seems to me to be your concern. It strengthens their hand in the United States. The much bigger concern, quite frankly, is the uncertainty that that litigation, the pending litigation, there is in terms of – So now you're getting to the point that I'm really interested. Yes. The cloud and now the uncertainty. Right. The problem I'm having is whether this actually satisfies a case in controversy doctrine. So let me ask, in that regard, what's our standard of review here? Well, the standard of review is basically a strain of it because it is a legal question based upon the unquestioned allegations of the complaint. As Judge Moore said earlier, this is sort of an assessment. Is this a ruling on the actual declaratory judgment, or are we looking at something before that, whether the court has jurisdiction over this case? The question of whether or not the court has jurisdiction is the question before the court. That was a question that was decided at the district court level where they concluded they didn't. We believe that there is a jurisdiction. We believe that under MedImmune, basically, you only need three things. Basically, what you need is a genuine patent dispute. It has to be concrete, real and concrete. It has to be definite, and you have to have adverse legal interest. Judge Stoll's questions really relate to the adverse legal interest, and we believe that when a product that our client manufactures is accused of having all the elements of a claim, which has existed both in the United States and in Mexico, that creates an adverse legal interest, and that is the entire thing. We believe that it is bad enough to be in a jurisdiction in Mexico where things move that way. Has Steller informed you that if they win, they are going to bring the Mexican judgment and they are going to sue you in the United States? They have not. They haven't told us they won't. If they told us they won't, that would resolve the issue, at least with respect to the declaratory judgment action with the patent act, not necessarily with respect to the unfair competition claim. They have not sued you in Mexico either, nor have they told you that they would, right? They have not. Do you have an identification agreement with the customers who have been sued or the distributors? The answer is, if you're asking is that alleged in the complaint, the answer is no. If you're asking in the real world, the answer is yes. It's true. It's also true it was not alleged in the complaint. On the record, what is the fact finding? I mean, what is the fact on the record? I don't want to go outside the record. On the record, there's no allegation one way or the other about indemnification. Is the agreement in the record? Is what? Is the agreement in the record? No. No. No. Okay, well, let's hear from opposing counsel. Mr. Lucan? I'm not sure if I used my time. I was hoping to have three minutes to go. I'll give you two minutes of rebuttal time. You used all of your time, but we'll restore two minutes. Mr. Lucan? Thank you, Judge Moore. John Lucan from Dinsmore for the defendant. Appelli, at the threshold, Your Honor, I would take the opposite approach from Mr. Lyles at the beginning. This case asks you to break new ground and to significantly undercut the whole approach of requiring a definitive case or controversy. There's been zero contact with my client versus their client relating to a U.S. patent here. There's been no act at all between the two clients relating to a U.S. patent here. Holding that, pursuing patent rights under a foreign patent with its own prosecution history, separate law, separate enforcement mechanisms, separate cost of litigation, possibly different recoveries that are available, it's an entirely different calculus to sue under a patent there than it is a patent here, regardless of the similarities between the two. And this basically says to someone, if you've made a decision to enforce against a third party, a patent in a foreign country, and it has alleged similarities, someone can accuse you of being tantamount or implied, even though you've had absolutely no contact directly, no act directed to the DJ. Your points are very well taken, and I'm cutting you off only because I understand them completely. I don't want you to think that I don't. But I do want to ask you, what if this hadn't been in a foreign country? What if this had been a distributor and a manufacturer in the United States with a single U.S. patent? How would you feel about his arguments about whether or not there are adverse legal interests under MedImmune if we were talking about distributors? Your patentee chose to sue distributors but not the manufacturer, and the manufacturer wanted to bring a separate DJ action against you in the U.S., and it was all related to a U.S. patent. You understand my hypothesis? Yes, Your Honor. I know it's not your case. I get that. But I'm just curious what your thoughts are or where your arguments go in terms of whether or not that would give rise to a case or controversy for declaratory judgment purposes. I concede at the outset it's a closer call. There's no question about that, and I won't act like there is. However, under the totality of the circumstances test, there's an awful lot that comes into play. I would offer, first of all, in Aris, as Judge Stoll pointed out, there's a requirement of one of two things, either an indemnity, which is not alleged, it's not on the record here, or an accusation of indirect infringement. In Aramis, some of the system claims, the statement was that, I think the court said, in some of the system claims, all of the components were provided by the declaratory judgment plaintiff. But what Aris doesn't say, I think your opponent helped me to appreciate that Aris doesn't say, but if you effectively argued direct infringement against me, it wouldn't count. You understand? His view is, look, they didn't accuse us of induced infringement because they're accusing us of direct infringement, basically. You understand? I understand that, Judge. A couple of things. I don't see Aris, to me, I think that he probably has a pretty good reading of Aris, in terms of it's at least confusing and doesn't totally answer this question. I would point out that Aris is also the same logic as Aris has been applied in the creative case that we cited in the brief, that involved creatine, I think some kind of body building. Is that a direct infringement case? I believe it was, Your Honor. There were lots of suits against other, and it's not a customer, but it's other people selling the same product under the same patent in the United States. No, I'm sorry, I am confusing. That was a customer case. And there the court, again, found the absence of the two steps in Aris and therefore moved on. And similarly, when there are suits against a host of competitors, so we're all in the market together doing all the same thing, and they're picking off one after the other under the same patent, so they haven't said anything directly to me yet. And even there, this court has required more. It's required something. For example, in Micron, Micron was last in line with the DRAM patents, and the plaintiff was going after people one after another. But there had been, albeit older, there had been communications directly to Micron, and there were multiple statements that they were going to enforce their rights against all infringers. So there's something else. So if one's going to, as Judge Rainer pointed out, the cases require an act. They require a communication. They require an act directed to the declaratory judgment plaintiff that indicates that there is an intent to enforce a patent right against the declaratory judgment plaintiff. I'm not sure MedImmune agrees with that articulation. I mean, show me in MedImmune where you get that from, where there has to be an affirmative act directed at the declaratory judgment plaintiff. I just think it says case or controversy in adverse legal interests. MedImmune dealt extensively within the main text with the effect of not paying or having to give up your license before you could challenge. Footnote 11 in MedImmune, which is relatively succinct, takes on this court's former reasonable apprehension test and says it's a totality of the circumstances. I would submit, Your Honors, that in taking that direction from MedImmune, from footnote 11 in MedImmune, back into the patent arena, this court has in multiple cases, Sandisk coming back almost immediately, is looking for an action. It's looking for something that the patent owner has done. It no longer has to create a reasonable apprehension suit, but it has to be something. Judge Moore, basically. I don't see anything. I'm looking at your footnote 11 now. I don't see anything in there which implies there has to be an act. It just sort of, as unfortunately many of these Supreme Court cases do, just rejects our prior law out of hand. It certainly did that. And in the text, I think Justice Scalia turned around and admitted that the Supreme Court presidency. In MedImmune, the court did require something that's definite and concrete. It has to be real and substantial, admit a specific relief through a decree or conclusive character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. I think the real and substantial element is particularly pertinent to Judge Moore's hypothetical. The adverse legal interest is the additional kicker that makes Judge Moore's hypothetical, the difference between Judge Moore's hypothetical and the fact that this is a suit in Mexico in this case makes the district court even more proper. So we start with real and substantial. The question of whether there's a sufficient cloud, as Your Honor said earlier, over the defendant's conduct that to use, I think, the phrase that Justice Scalia did in MedImmune about the plaintiff has eliminated the own threat to itself. It either has to face the threat or it has to quit doing the conduct. You don't have to bet the farm. You don't have to get arrested for a lot of criminal case analogies. But that would be true if we were totally in the U.S. and we've got a supplier-manufacturer scenario and there's a lawsuit moving forward against the supplier and it's not looking good. And the manufacturer is now in this sticky wicket of, oh, no, I'm going to be on the hook for willful infringement here. I need a resolution. I am producing these things. Your Honor, I would submit that under the totality of circumstances that it's not an open and shut and it's not an absolute rule. I mean, if there were multiple, multiple, multiple customers being sued, that certainly would weigh in favor of finding it. You have a very narrow case and it needs to be decided narrowly because I think some of these other issues that I'm bringing up and we're discussing are troubling to me because, of course, if certainly a manufacturer and a supplier would allow for DJ jurisdiction because it is the same product, not an identical product, but the actual same physical product, then the question becomes what if two distributors or two manufacturers are making identical products? And then, of course, it comes a little further. Well, what if they're not identical in all respects but they're identical insofar as the patent is concerned? You see where my concern goes as this plays itself out in terms of the potential number of lawsuits and difficult issues courts would be confronted with in a DJ context. Yes, Your Honor, and that's why my suggestion was initially in response to your hypothetical that I think it moves it closer and depending upon the totality of circumstances, it is possible that in that situation I could see an argument being made that has a lot more supporting it than here, that that might give rise. Although it is a slippery slope that this court has not, I don't think, yet gone down and it would be, I think, heavily dependent on the facts and the multitude of threats. And we don't need to go down that road in your case because we've got this giant gaffe between that hypothetical in your case because yours involves a whole different country, a whole different patent. Precisely, because in that case you would be invited to infer from actions against other American companies. It's not that they're American or not American. It's not where you pick up the phone. It's a U.S. patent and its conduct in the U.S. That's the more pertinent way of phrasing it. But you'd be offered facts that are closer and being urged the cumulative effect of those might be enough to tip in favor of jurisdiction. And while that's conceivable, I don't think that the court has to even wade into that at all in order to affirm the district court's decision here since it was so clearly based on the lack of anything as to them other than action, the lack of anything as to them. It was actions in Mexico under Mexican law. So while I think your hypothetical gives sort of a slippery slope that you might have to go down when that case gets in front of you, ours is more of a cliff. I mean, it just says that a decision to sue someone else, even if the product is the same product, but to sue in Mexico under Mexican law where the procedures are different. I mean, Cuozo says that the difference between broadest reasonable interpretation and Phillips construction can tip the difference here, even though everything else is the same. This court's decision earlier in the year, and I think it was Novartis says that, I think that was invalidity, not infringement. But just who has the burden between preponderance of the PTAB and clear convincing in a district court case can make a whole world of difference about invalidity. So these tiny differences, even within our own law, can change the result. Holy cow, now we're going to Mexico under Mexican law where it's completely different. The complaint that's asserted against us here has a lot more than is supposedly even involved in the Mexican case. I mean, there's an inequitable conduct enforceability argument, and I'm not even sure that's available in Mexican law. So the complaint itself gives plenty of reasons why someone might sue under its rights in Mexico and not have made a decision as to whether they're going to do anything here and certainly not commit an affirmative act in that regard. I don't want to keep the court any longer than I need to. Thank you, Mr. Lucan. Mr. Lyles, I said I'd restore two minutes of rebuttal time. Yes, Your Honor. First of all, with respect to Arias, let me just direct the court's attention to page 1374. And what it says there, it says an adverse legal interest requires a dispute as to a legal right as, for example, an underlying legal cause of action that the declaratory defendant could have brought or threatened to bring. We believe that that's exactly what happened here. We believe we met the adverse legal interest test. We also believe that the only thing that Medibune, or my view of Medibune, quite frankly, is that any time there is an affirmative act where a patent owner is using a patent to put uncertainty and to require a competitor to operate in an environment where there's uncertainty about whether or not there might be legal ability and there is a real and concrete standard, then the underlying gist of Medibune, the whole philosophy of it, is that that invokes declaratory judgment action. It would be kind of hard to get around our Prasco case if that were the standard of Medibune. Okay, Prasco. Let me address Prasco. Prasco, there was absolutely nothing. That was truly self-induced fear and apprehension on the part of Prasco. There's absolutely nothing that the patent owner did. There was never any contact. There was anything. Here we have an act, even though it's in a foreign country, but, you know, as this Court's cases in Arkema and Asia Vital, you know, they all have recognized that, you know, So here we have action. It's against, not against an ally, but against its product in a different country. And here we have an identical patent with identical claims. Okay. And in our view, you know, their allegation that they haven't decided what they're going to do, it's sort of like this, I refer to it as a magical border analogy that, you know, they say our product has elements A, B, C, and D when it's in Mexico. When it comes to the United States, you know, all of a sudden they don't know whether it does or not, and they don't know whether or not they're going to sue. Maybe they won't sue in the U.S. As I understand their argument, it's that they might not choose to file suit in the U.S. against customers or against the manufacturer or client. If they don't, they would never give us a chance to correct the damage that's been done in the marketplace by the threat that's over there. Damage hasn't been done in the U.S. marketplace. It's been done in the Mexican marketplace. There is no legal impact of the Mexican judgment in the U.S. market. There's no legal impact, but there is a marketing impact because the claim… And an unfair competition claim in state law. Well, there is such a claim, but we also believe… It's not a patent case. That's an unfair competition claim. Well, we believe that we meet all the standards of Medibune. We believe that it's definite and concrete. In fact, we're talking about not only the patent, we're talking about specific claims of the patent that are alleged to be infringed. We believe it touches the Everest League winters for the reasons I mentioned before from Eris and other cases, and we believe it's a real and substantial thing. We believe that it's incumbent upon the court to find a declaratory judgment jurisdiction that exists here. I have an unrelated question, which is, is there an IPR or any other kind of proceeding pending in the U.S. on the U.S. patent? Not to my knowledge. Okay. I thank both counsel. The case is taken under…